May it please the Court, my name is Holly Sullivan of Federal Defenders on behalf of Mr. Ayon-Contreras. If I may reserve two minutes for rebuttal. Sure. Mr. Ayon-Contreras was stopped and questioned without reasonable suspicion. Border Patrol agents were called to the Frosty Burger restaurant by a citizen's call or an anonymous tip. Based upon that tip of two subjects outside the Frosty Burger restaurant in Pine Valley, California, agents responded to the restaurant, saw a Mexican man standing in a phone booth outside the restaurant, and proceeded to follow him. Two armed agents yelled, don't move, and questioned him about his citizenship and his right to be in the United States. There was no reasonable suspicion to support the stop and interrogation of Mr. Ayon-Contreras. Counsel, you said they followed him. Correct, Your Honor. The facts that when he saw the two uniformed officers arrive in a marked Border Patrol automobile, he started to walk away from them, and they followed him to find out where he was, and he was hiding behind the Frosty Burger in a walled enclosure? The record, Your Honor, was that at the time the agents arrived at the Frosty Burger restaurant, that Mr. Ayon-Contreras was in a phone booth and began to walk towards the back of the restaurant. The agents testified that at no time did Mr. Ayon-Contreras make eye contact with Agent Espinoza or Agent Miller. At no time was there any contact between the agents and Mr. Ayon-Contreras up until the moment when Mr. Ayon-Contreras was cornered behind the restaurant. Crouched down, trying to hide. Mr. Ayon-Contreras was knelt down on one knee and was looking down at the time when Agent Espinoza approached him. Does that have anything to do with the consideration of was there reasonable suspicion? It does, Your Honor. In this case, the district court's findings were that the district court found at the time that Mr. Ayon-Contreras walked towards the back of the restaurant that a reasonable inference could be made that he was attempting to evade authorities or was attempting to hide or conceal himself. The area in which Mr. Ayon-Contreras was found in the back of the restaurant was a storage area. There were mops, brooms, garbage cans in that area. If Mr. Ayon-Contreras, in fact, was attempting to hide or to evade authorities, he could have hidden in that area. He could have hidden behind garbage cans, behind brooms and mops. They could have done it differently, but was there really any question that this was at least suspicious? That, you know, somebody walks to the back of a restaurant and all of a sudden is crouching down, doesn't work there, has no real reason to be in that area? Wasn't that suspicious all by itself? There are innocent explanations as to why Mr. Ayon-Contreras could have been behind the restaurant. The agent, Agent Espinoza, did not testify that there was any inference that she drew that Mr. Ayon-Contreras' behavior was evasive or that she found his behavior suspicious. And the agent's observations should be taken into account in this situation. There was no testimony of the significance of Mr. Ayon-Contreras walking or the significance of Mr. Ayon-Contreras being behind the two walls or being between the two walls in the area behind the Frosty Burger restaurant. The sole reason that agents went to the Frosty Burger restaurant was based upon an anonymous tip. It was a call from a cashier within the Frosty Burger restaurant. That call gave no identifying characteristics. The call simply stated that there were two subjects outside the Frosty Burger restaurant in Pine Valley, California. Based upon that tip, the agent stopped a Mexican man standing outside a restaurant, an open restaurant, during daylight hours. Now, that area has a Hispanic population and there are numerous people within that area, approximately 20 miles from the United States-Mexico border. The tip gave no prediction of future activity. There was no prediction. Well, does that really matter? In other words, let's assume that with no tip they had simply gone there to get a hamburger. And they see a Mexican man, Mexican-appearing man, whatever that is, in the phone booth who walks away as soon as they show up. So does it really matter they got no information on the tip? They could have just been there to get a burger. It matters, Your Honor, in that the sole reason the agents went to the restaurant in this case was based upon that tip. Agent Espinoza testified the only reason that they went to the Frosty Burger restaurant was based upon the citizen's report that came over dispatch, based upon the call from the cashier at the Frosty Burger restaurant. And that's the sole reason that agents were at the Frosty Burger restaurant at that time. When agents responded to the tip, the tip was for two subjects outside the Frosty Burger restaurant. And when agents responded to the tip to the Frosty Burger restaurant, they didn't see two people outside the restaurant. The tip was not corroborated. They saw one person standing outside the restaurant, Mr. Leon Contreras, and proceeded to follow him towards the back of the restaurant. Now, there was another man, though, that they picked up, but the record's kind of foggy on how they found that other man and so on. That is to say, after Mr. Leon Contreras was, I guess I'll say, immobilized, then the other agent went off and got the other man. What do we know about that? Do we know anything from this record? We don't know very much information about that, Your Honor. The only information that was given was Agent Espinoza, after telling Mr. Leon Contreras, don't move, questioning him as to his citizenship, then told Mr. Leon Contreras to sit down, and she stated that she went to look for the second subject. Now, did she say that she went, or did somebody else go? Agent Espinoza went and left Mr. Leon Contreras with another agent. I see. Okay. Yeah. Agent Espinoza stated that she did, in fact, arrest a second person, but there is no information in the record as to how that arrest occurred. Or how they had spotted that other person. There's no information in the record about that. I see. But given the fact that another person was apprehended, it's a bit of a stretch to say he was the only person they could see, because somehow they figured out there was somebody else around. From the way that the record reads, when agents arrived, the only person they saw was Mr. Leon Contreras, because both agents began to walk in the same direction as Mr. Leon Contreras. So there's no evidence that at the time they arrived at the restaurant, they saw a second person. Okay. I'm with you. Counsel, may I ask you this? Where in the record do you find that the officer arresting, investigating Leon Contreras told him that Flores Espinoza Mansa, where did she detain him before finding out that he was illegal? Why shouldn't his admission that he was illegal in an investigatory search be admissible as reasonable grounds for arresting? Agent Espinoza approached Mr. Leon Contreras in an area between two walls and stated to him, don't move. No, no. Where do you find that? And when you approach the defendant, what, if anything, did you do? I let my partner know the defendant was going between the walls, and I headed toward the east side. And when you got to the defendant, how did he appear? The defendant was on one knee looking down. Now, the two walls, could the defendant have turned around and walked away from you? Yes. So there was an opening on the west side between the two walls. There was an opening on the west side and east side. Yes. Did you identify yourself as a border patrol agent? Yes, I did. And did you say anything to the defendant besides that? Not, don't move. I asked the defendant if he was legal in the United States. And what, if anything, was his response? He stated he was he wasn't legal. What more do you need? Why should that evidence be suppressed? Wasn't that an investigatory search? Does he have to be Mirandized when she's making an investigatory search? Is that your argument? No, Your Honor. In this case, at the time that Agent Espinoza, I see my time is nearly up, Your Honor. That's all right. At the time that Agent Espinoza approached Mr. Leon Contreras, she was an armed officer in uniform. And when she approached Mr. Leon Contreras at the, in the excerpt, page 60, she stated to Mr. Leon Contreras when she saw him, she said, don't move. And then she proceeded to question him concerning his citizenship and his right to be within the United States. So that's, that's excerpts page 60. Page 60, Your Honor. The witness at the bottom says don't move. Okay. And the district judge took that as true? Correct, Your Honor. The district judge did not take as true that she had her weapon drawn, although she said she did not. Mr. Leon Contreras, in his declaration, says she did have her weapon drawn. The district judge finds that that's not true. That's correct, Your Honor. Mr. Leon Contreras submitted a declaration stating that that is what occurred. The testimony that the district court relied on from Agent Espinoza was that Agent Espinoza was armed at the time that she approached Mr. Leon Contreras. So let's take a favorable view. Let's suppose Agent Espinoza forgot to say in her direct testimony that she first said that don't move before he, before she asked him about his immigration status. Let's suppose she said don't move. Should she at that point have Mirandized him before she asked him about his immigration status? Is that your position? Your Honor, at that point, Mr. Leon Contreras was in custody, and she should have Mirandized him based upon the fact that he was in custody and was not free to leave. In this case, the issue is whether or not Agent Espinoza had reasonable suspicion to detain him. And at that point, after she had asked him or told him don't move, she then proceeded to ask him questions about his immigration status, then told Mr. Leon to sit down on his butt and left him with Agent Nuilla. And at that point is when Agent Espinoza went to look for a second subject and ultimately arrested a second person based upon this case. I think we've got your argument in hand. Why don't we hear from the other side? We've run you over, so we'll give you a chance for a vote. Thank you, Your Honor. May it please the Court, my name is Larry Spong. I represent the United States in this matter. Illinois v. Ward Law teaches us that nervous, evasive behavior may give rise to reasonable suspicion. That's exactly what we have in this case. The defendant's attempt to hide behind the restaurant upon the approach of Border Patrol agents is exemplary of evasive behavior. As Ward Law says, unprovoked flight, in this case, unprovoked flight hiding, unprovoked hiding, I think it was provoked. I think your argument is that it's provoked. As you say, he sees them coming and he hides. What do you mean unprovoked? Well, in the same way that it was unprovoked in Ward Law, that is, that person also saw the officers coming. And it's unprovoked in the sense that there's no other explanation other than he's running, he's evasive, running away from officers. Provoked by the presence and perception of the officers. Yes, yes, exactly. As Ward Law says, that is not a mere refusal to cooperate. In fact, it's just the opposite. So under the totality of the circumstances here, we have the officers have reasonable suspicion. Ward Law also teaches us that reasonable suspicion has to be based on the common sense judgment and inferences about human behavior. Let me ask you a question. Yes. The district judge seems to have thought that the Frosty Burger was about three-and-a-half miles away from the border. But I'm told by his lawyer that it was 20 miles. The judge was incorrect, Your Honor. Where did that come from, the three-and-a-half miles? I think it's probably from the judge's own experience. There was testimony that the agents came from the Campo Border Patrol Station. Campo is about, is very close, probably three-and-a-half miles from the border. Your brief says, I mean, I pick up three-and-a-half in your brief. Yes, yes. But it refers to where they're working. Yes. Well, I mistakenly as well as the judge, I looked at the judge's findings and quoted from the judge's findings. After I received the response brief, I obviously looked at the map and realized what the mistake was. But there's no question that it's about 20 miles. I would say probably as the eagles fly about 15, probably 20 by driving. If the eagle has to walk, it's about 20 miles? Yes. Yes, absolutely. Yes. But the significant, whether it's three-and-a-half or 20 miles, that's not significant. What's significant is this particular area is known for a place where illegals enter, and it's known as a place to circumvent a checkpoint. That's the testimony, and that's what was found by the court. Now, where's the testimony as to it's known? Yes, it's on page 31 of the excerpts of record. Okay. There were two questions by the government attorney. They were certainly just sort of summary questions. Okay. Could you read the testimony on which you're relying? Yes. Were you the attorney at that ball? I was not. Okay. And it is near the bottom. And based on your experience of that area, is that an area known for the entry of illegal aliens? Yes. And a few people attempt to circumvent the checkpoint through that area? Yes. Okay. And her experience at that time was? Her personal experience, that is, working there was approximately two weeks. Right. However, her experience in total doesn't include just her personal knowledge, but her knowledge, that is, of other agents there. Yeah, but that's not the question. Exactly. The question was based on your experience. Right. And she says, the previous sentence, you've been working in this area, Pine Valley area, for some time? I've been working there, yes. She doesn't quite fess up on new here, does she? No, that's correct. And then based on your experience, and I assume the questioner may know that she's new there, too. They're both kind of sliding off. Well, I've been here for two weeks, and somehow my friends tell me that. You know, I'm willing to accept that this happens, but I don't really like this sort of slightly evasive line of questioning and answering. And, Your Honor, I agree. It's too summary. It's just quick questions. No, I'm not saying it's summary. I'm saying there's a little bit of slipperiness to it. Well, I agree in the answer that, yes, I've been working in that area. She should have been more open right at that moment. But I'm also going to look at the question that was asked before. You have been working there, quote, for some time? Some time or not. If I want to know, have you been working there for two weeks? I don't say have you been working there for some time. Now, she does not lie. She just says I've been working there, yes. Yes. But this isn't the – somebody's playing games with those questions. Okay. Your Honor, and I don't know what was in the prosecutor's mind when he asked that or what he knew or didn't know about that particular agent's experience in that area. Somebody knew because it comes out on cross. Right. Absolutely. Somebody asked on cross, and she's only there for two weeks. I can't deny that. And can't deny that the way this looks certainly doesn't look good. But as I said, I don't know what was in the prosecutor's mind. He may have been just asking. But I think – Okay. I've made my point, and you may wish to speak to that person when you go back. I will. Absolutely, Your Honor. And I will be happy to tell them about the concern. And I agree. However, experience isn't just limited to personal experience. Experience includes what I know – Maybe you didn't get my point. No, no. The question does not ask what is the general experience of officers. The question asks what is your experience. I agree. Okay. I agree. Under the totality of the circumstances here, I think we have quite clearly more than enough for reasonable suspicion. We have an area known for entry. We have an area known to circumvent a checkpoint. There is a person at the phone booth when the agents arrive. They arrive in a marked car in a uniform, and the woman in the restaurant points towards that person in the phone booth. That person then immediately heads to the back of that building. The agent goes the other way. There's apparently a storage area behind the building and a little sort of alleyway or a little area three to four feet wide. She gets over behind that second building and sees the person go in. She then goes around to the other side to wait for him to come out. He doesn't. She then looks in from that other side and sees him kneeling down with his hands in front of his head. Now, I think the common sense judgment and inference is he's attempting to hide from that. Now, at that point, was the other officer at the other end of that passageway? That is a good question because I think the record's a little unclear, but I think she finally clears it up on cross-examination when she says he eventually did make it there, but if that was he made it there, but when she said he's she saw him there. He comes around to her side. So. Now, when you say that, what part of the testimony are you relying on? On cross-examination, Your Honor. Let's see. Okay, at the bottom of page 58, and Mr. Contreras was kneeling down. Yes, what happened when I came to the end of the building, the same end where I could see my partner, I saw the back part of Mr. Contreras go in between the walls. So that's where she's behind the building, and the partner's coming towards that area, and she saw him go in the wall. So what I did is I came back from where I came from, in other words, back around to the other side, thinking he's going to come out through there. That's why I was, when I saw him and I went to see who was between the two walls, he was kneeled down. So I think what it is is that they were radioing back and forth, partners coming up to that other end, but as that happens, she sees Mr. Contreras dart in there. She then goes around, and her partner follows her around. It seems to be that's what she's saying there, because he comes around. So in your view, he does not arrive at the same time, he arrives only later? Yes. I suggest you look at page 56. Okay. Line 24. Question, you reach the area between the two walls at the same time, yes? Okay, so he's standing at one end and you're standing at the other end? Yes. And at that time, I let him know that I had seen the subject. I don't think that's contradicted. Her testimony is pretty clear. They arrive at the same time, and he's blocked. He's got an agent at each end. Well, I believe she clarifies that later, but I would. I don't know how you clarify that. That's already pretty clear. And the reason I focus on this is that the district judge seemed to have missed that. The district judge decided that this was consensual. Yes. And I'm trying to figure out how the district judge could have concluded that in light of this uncontradicted testimony and how the U.S. attorney could have allowed the district judge to conclude that in light of this uncontradicted testimony from his own witness. Because there is somewhere in the record, I believe, I think that you can see that. Try page 57, line 5 through 11. Particularly line 8. And my partner was not at the intersection. Yes. And later on. And your partner never came back. He was headed towards where I was. Your partner never reached the area. He reached the area, but once I had already approached the gentleman, I told him that I had found him. I told him that he was over in my area. I think that goes back to, you know, he had come around that side of the building. I think, at best, the record is just unclear here. You know, I'm going to back off in light of that. I take back what I said. Okay. I just think it's unclear, somewhat unclear. Okay. But even if, I guess the bottom line is, was there a stop here in response to a show of authority? No. He stopped on his own. It would be the same as if an officer pulled up to a vehicle already stopped and asked someone to get out of the car. The don't move is similar to asking someone to get out of the car. That has always been considered. U.S. versus Kim is one case. That's a consensual stop. I think it's on that basis that the judge really was saying this is consensual. He was already stopped. Don't move didn't convert it into non-consensual because it is similar to that. And there are other explanations for don't. It doesn't mean don't run away. It could mean the officer was not brandishing a weapon. It could mean don't move. I don't want you to start reaching for something. I don't want you to come attack me. Just stay there so I can attack. But that's obviously the weaker ground. You've got two of the other ones. I believe that is the weaker ground, absolutely. But I do believe under the totality of the circumstances with everything that went on there, this is the exemplary of the very kind of nervous, evasive behavior that ward law talks about. Unless the court has any other questions. Thank you very much. Thank you. I do appreciate the further time, Your Honors. I will be very brief. Yeah. I would like to address a few of the points that the government had brought up within the district court's ruling. The factors that the district court relied upon were that the area was an area three and a half miles from the border, which the government has conceded is a measurement that was in error. In fact, it was about 20 miles from the United States border, which also would encompass many different areas, including the population of San Diego would all be contained within 20 miles from the United States border. The district court also took into account that the agents had responded to this area before. And again, as many other parts of the record, this part of the record is also somewhat spotty. The officer testified that they had received calls from the Frosty Burger restaurant in the past. There was no information about the actual cashier who had called in this case. Agent Espinoza testified that she did not know who the cashier was who had called in, that she did not have any contact with that cashier. Upon arriving at the restaurant, she had no contact with that cashier, and it had no further information about the actual reliability of that particular cashier. Okay. Thank you very much. Thank you. Thank both sides for their helpful argument. The case of United States v. I.M. Contreras is now submitted for decision. The next two cases on our calendar have both been submitted on the briefs. Those cases are United States v. Perez Amaya and Harris v. Baca.
judges: T.G. Nelson, W. Fletcher, Bea